IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

FERNANDO CRAWFORD

CRIMINAL ACTION FILE NO.

1:18-CR-318-MLB-JKL-2

## FINAL REPORT AND RECOMMENDATION

The case is presently before the Court on Defendant Fernando Crawford's

motion to suppress statements he made during a custodial interview following his

arrest on August 22, 2018.  [Doc. 78.]  On July 26, 2019, I held an evidentiary

hearing on the motion, at which FBI Special Agent Paul Fike, one of the agents

who interviewed Crawford, testified.  [Doc. 94.]  Transcript references are to the

transcript of that hearing.  [Doc. 100 (hereinafter "Tr.")].  Following the hearing,

Crawford submitted a brief in support of his motion [Doc. 99], the government filed

a response brief [Doc. 102], and Crawford a reply [Doc. 104].  The Court also

directed supplemental briefing about a specific portion of the agents' interview

with Crawford [Doc. 105], but, as explained below, supplemental briefing is no

longer needed because the government does not intend to use that portion of the

interview in its case-in-chief at trial.    For the following reasons, it is **RECOMMENDED** that the motion be **DENIED**.

## I.    SUMMARY OF CHARGES AGAINST CRAWFORD

The charges in this case out of an alleged scheme whereby Crawford and his wife, co-defendant Leena Awad, embezzled funds from Ms. Awad's former employer, Flood Brothers, Inc.   [*See* Doc. 1 (Indictment).]   According to the indictment, Awad formerly worked at Flood Brothers as a payroll and human resources specialist, handling payroll for the company.   [*Id.* ¶¶ 2-4.]   Allegedly, Awad fraudulently added Crawford to the company payroll, which resulted in Crawford receiving a paycheck, even though he was never employed by the company.   [*Id.* ¶¶ 7-9.]   The indictment identifies nine specific dates from March 2014 to December 2015 on which Awad allegedly emailed false payroll information to the payroll vendor and, for each instance, the corresponding gross payment to Crawford.   [*Id.* ¶ 12.]   The scheme allegedly caused a total loss to Flood Brothers of over a million dollars. [*Id.* ¶¶ 1, 9.]

The indictment further alleges that on or about August 3, 2014, Crawford completed an Affidavit of Support, Form I-864, in support of an immigration application submitted by Awad, and represented, under penalty of perjury, "that he was currently employed at 'Flood Brothers, Inc.' as a 'Senior Project Manager.'"

[Doc. 1 ¶ 16.] According to the indictment, Crawford knew his statement was false, in that he did not work for Flood Brothers. [*Id.*]

On August 16, 2018, Crawford was indicted on one count of conspiracy to commit wire fraud, 18 U.S.C. § 1349 (Count 1); nine substantive counts of wire fraud, 18 U.S.C. § 1343 (Counts 2-10); and a single count of false swearing in an immigration matter, 18 U.S.C. § 1546(a) (Count 12).[1]

## II.   FACTS

On the morning of August 22, 2018, eight to ten FBI agents, including SA Fike, arrived at Crawford and Awad's residence to execute warrants for their arrest on the indictment in this case. (Tr. at 4-5.) After securing the perimeter of the house, a team of agents approached the front door and knocked and announced their presence. (*Id.* at 6.) Crawford and Awad came out of the house and were handcuffed. (*Id.* at 7.) SA Fike and FBI Special Agent Joseph Stites then approached Crawford, introduced themselves, and escorted him to a car to transport him to the federal courthouse for processing. (*Id.* at 7-8.) The agents did not yell

---

[1] Awad is also charged in Counts 1 through 10. She is separately charged in Count 11 with allegedly misrepresenting in an Application to Register Permanent Residence or Adjust Status, Form I-485, "that she had not 'committed any crime of moral turpitude . . . for which [she had] not been arrested,'" in violation of 18 U.S.C. § 1546(a).

at Crawford or exert physical force on him, nor did they have their firearms drawn

on him.   (*Id.*)   SA Fike and SA Stites placed Crawford, whose hands remained

handcuffed behind his back, in the rear seat on the passenger side of the car and

belted him in.   (*Id.* at 8.)   SA Stites drove the car, and SA Fike sat in the rear seat

next to Crawford.   (*Id.* at 8-9.)   The agents' handguns remained holstered.   (*Id.* at

9.)

At approximately 7:08 a.m., the agents began to interview Crawford.   (Tr. at

9.)   The interview was audio recorded.   (*Id.*[2])   At the outset of the interview, SA

Fike advised Crawford of his *Miranda* rights, reading verbatim the FBI Advice of

Rights form, FBI Form FD-395.   (*Id.* at 10-12; File 1 at 0:40-1:13; Gov't Ex. 2

[Doc. 96 at 3].)   Crawford verbally indicated that he understood his rights and

waived his rights.   (Tr. at 10; File 1 at 1:13-1:20.)   He did not execute a written

waiver because he was handcuffed in the car at the time.   (Tr. at 10.)

---

[2] A disc containing the recording of the interview was admitted into evidence
as Government's Exhibit 1 at the evidentiary hearing.   [*See* Doc. 95.]   The CD
contains two files:   180822_001.mp3 ("File 1") and 180822_002.mp3 ("File 2").
The parties did not provide a transcript of the interview, so in referencing specific
portions of the interview, the Court refers to File 1 and the approximate elapsed
time according to the software program that the Court used to listen to the
recordings.   As explained below, the government does not intend to use the portion
of the interview contained in File 2 in its case-in-chief.

Crawford proceeded to answer questions for approximately ten minutes. (Tr. at 12; *see* File 1.) At around 7:19 a.m., Crawford stated that he no longer wanted to answer questions, so the agents concluded the interview at that point and turned the recording off. (Tr. at 12.) Before and during the interview, the agents did not yell at Crawford, draw their weapons, and or make any promises or threats. (*Id.*) Indeed, at no point during Crawford's encounter did SA Fike or SA Stites point a weapon at him or use physical force. (*Id.* at 15.) The tone of the interview was calm and professional; the agents did not yell, scream, or verbally intimidate Crawford at any point. (*Id.*) Crawford also appeared coherent at all times, and he did not appear to be under the influence of alcohol or any other substance that might affect his ability to answer questions. (*Id.* at 16.) He also did not ask for an attorney. (*Id.* at 17.)

The interview briefly resumed at about 7:22 a.m., and Crawford answered questions for about six more minutes. (*See* Tr. at 13.) On September 23, 2019, counsel for the government notified the Court and Crawford's counsel by email that it does not intend to use that second part of Crawford's interview (*i.e.*, the portion of the interview after Crawford indicated he did not want to answer questions) in its case-in-chief at trial. Thus, in the following analysis, the Court

considers only the validity of Crawford's *Miranda* waiver and the voluntariness of

his statements as to the first part of the interview, contained in File 1.  Additional

facts are discussed in context below.

## III.    DISCUSSION

The Fifth Amendment provides that "[n]o person . . . shall be compelled in

any criminal case to be a witness against himself."  U.S. Const. amend. V.  In

*Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court created a

presumption that statements elicited during a custodial interrogation of a suspect

are coerced unless the suspect is first advised of his constitutional right to remain

silent and to have an attorney present during any questioning.  *United States v.*

*Patane*, 542 U.S. 630, 639 (2004); *Miranda*, 384 U.S. at 444-45.  "[T]he accused's

statement during a custodial interrogation is inadmissible at trial unless the

prosecution can establish that the accused 'in fact knowingly and voluntarily

waived [*Miranda*] rights' when making the statement."  *Berghuis v. Thompkins*,

560 U.S. 370, 382 (2010) (second alteration in original) (quoting *North Carolina*

*v. Butler*, 441 U.S. 369 (1979)).  This inquiry has "[t]wo distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather
> than intimidation, coercion, or deception.  Second, the waiver must
> have been made with a full awareness of both the nature of the right
> being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).   "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."   *Id.* (quotation omitted).   Ultimately, it must be shown by reference to the totality of the circumstances that the defendant's statement was "'the product of an essentially free and unconstrained choice.'" *Parker v. Allen*, 565 F.3d 1258, 1280 (11th Cir. 2009) (quoting *Hubbard v. Haley*, 317 F.3d 1245, 1252-53 (11th Cir. 2003)).

Even if the Court finds that the government complied with *Miranda*, the government must still establish that a custodial defendant's statements were voluntary.   *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) ("Determining the admissibility of a postarrest confession requires a two-part inquiry.   We first decide whether the law enforcement officers complied with the requirements of *Miranda v. Arizona*; if so, we then determine if the confession was voluntary."   (citations omitted)); *United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government has complied with the *Miranda* requirements.   Upon finding compliance with *Miranda*, the court then rules on the confession's voluntariness.").   "Voluntariness of statements is

7

analyzed similarly to voluntariness of the *Miranda* waiver." *United States v. Byrd*, No. 1:16-CR-315-TWT-AJB, 2017 WL 3821696, at *5 (N.D. Ga. Aug. 7, 2017), *report and recommendation adopted*, No. 1:16-CR-315-2-TWT, 2017 WL 3783029 (N.D. Ga. Aug. 31, 2017).

Turning first to the voluntariness of Crawford's *Miranda* waiver, the Court readily concludes that he knowingly, intelligently, and voluntarily waived his right to remain silent and right to counsel.  Crawford was undoubtedly aware of his rights.  SA Fike advised him of his rights from a standard preprinted FBI form almost immediately after he was placed in the car for transportation for processing, before any substantive questions were asked of him. Crawford stated that he understood his rights, and there is no indication that he suffered from any disability or impairment that would interfere with his ability to understand those warnings or the rights that he would give up.  He also verbally indicated that he waived those rights and was willing to answer questions.

Crawford's waiver was also voluntary. He was in no way coerced into waiving his rights.  Neither SA Fike nor SA Stites threatened, intimidated, or made promises to him to get him to waive his rights.  Nor did they did yell at him, point their guns at him, or use physical force.   Considering the totality of the

circumstances, then, the Court finds that Crawford's waiver was knowingly, voluntarily, and intelligently made.

As to the voluntariness of the statements following the *Miranda* waiver, the finds that his statements were voluntarily for essentially the same reasons. His questioning began shortly after he was placed in the car for transport for processing and the interview was very brief. (*See* Tr. at 15.)  The tone of the questioning was conversational; he was not threatened or intimidated; the agents did not display their weapons; and he was not promised any benefit if he answered questions. Significantly, Crawford exercised his right to stop answering questions after approximately ten minutes, which also demonstrates that he recognized that he had a choice whether to answer questions.

Crawford argues that the government has failed to show that Crawford's statements were voluntary because at the time he was advised of and waived his rights, his hands were handcuffed behind his back while he sat restrained in the rear of the car and the agents did not stop the car to give him "an opportunity to be comfortable, take a break or use the bathroom." [Doc. 99 at 4.]   The Court

disagrees.[3]  Being handcuffed behind the back and restrained by a seatbelt falls fall

short of the type of physical duress that would make the environment so coercive

that it overbore Crawford's free will.  *See Shriner v. Wainwright*, 715 F.2d 1452,

1456 (11th Cir. 1983) ("The use of handcuffs does not establish coercion . . . .");

*United States v. Ogden*, 572 F.2d 501, 502 (5th Cir. 1978) ("The fact that defendant

was wearing handcuffs does not indicate or even suggest that he was coerced.");

*see also United States v. Hernandez*, No. 1:13-CR-183-WSD, 2014 WL 869275, at

*6-7, 13 (N.D. Ga. Mar. 5, 2014) (finding that suspect was not coerced into waiving

his *Miranda* rights and speaking with agents where he was placed him in a vehicle

for transport to the federal courthouse in Atlanta and restrained with handcuffs,

ankle shackles, and a belly band), *report and recommendation adopted*, *id.* at *4.

As for the purported need for a break, the entire car trip from Crawford's residence

to the federal building took approximately 45 minutes—hardly a prolonged period

of time—and, in any event, at no point during the trip did Crawford ask for food or

drink or to use a restroom.  (Tr. at 17.)

---

[3] The Court notes that Crawford does not specify whether he is challenging the voluntariness of his *Miranda* waiver, his statements, or both.  Giving Defendant the benefit of the doubt, the Court assumes that he challenges the voluntariness of both, and, therefore, the Court's analysis applies to both the *Miranda* waiver and his subsequent statements.

10

Crawford also argues that his statements were the result of "threats and intimidation." [Doc. 99 at 4.] Specifically, he argues that when SA Fike began the interrogation, SA Fike showed Crawford "immigration forms purportedly completed by Mr. Crawford and further questioned him about sponsorship of his wife." [*Id.*] SA Fike also warned Crawford that falsely filling out immigration forms may qualify as perjury. [*Id.* at 4-5.] According to Crawford, the questioning about the immigration forms "clearly placed Ms. Awad's immigration status and deportation to the forefront of the interrogation" and referring "to the crime of perjury can arguably impact the voluntariness of a confession." [*Id.* at 5.]

These arguments are without merit. For starters, neither SA Fike nor SA Stites referred to Awad's immigration status or the possibility of her deportation during their interactions with Crawford; thus, it cannot be said that used the threat of criminal punishment to coerce him to speak. But even if the agents implied that Awad could face deportation if convicted, their conduct falls far short of the sort of intimidation or coercion that would render Crawford's statements involuntary. Indeed, advising a suspect about potential penalties that he faces if convicted is generally not sufficiently coercive to render a waiver or statement involuntary. *See, e.g., United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990) ("[T]elling the

[defendant] in a noncoercive manner of the realistically expected penalties and

encouraging [him] to tell the truth is no more than affording [him] the chance to

make an informed decision with respect to [his] cooperation with the government."

(alterations in original) (quotation omitted)).  Considering the circumstances of the

interview, any insinuation that Awad's immigration status could be in jeopardy or

that she could face deportation did not render Crawford's waiver or statements

involuntary.

Crawford's argument about perjury also falls flat because SA Fike did not

refer to perjury in a coercive or intimidating manner.  SA Fike questioned Crawford

about the accuracy of his responses on immigration form I-864, including

Crawford's statements about his income and that he worked at Flood Brothers.

Believing that Crawford was being less than forthcoming in his responses about

when he worked at Flood Brothers and when he left, SA Fike pointed out that the

I-864 signature area provided as follows:

> **SA Fike**:  I want to point out something here on the I-864.  On this
> page eight of nine where it has your name and then your signature, it
> says, "I Fernando Crawford certify under penalty of perjury under
> the laws of the United States that I know the contents of this affidavit
> of support that I signed all the factual statements in this affidavit of
> support are true and correct."
>
> **Crawford**: Yeah.

**SA Fike**:  So, I just want to highlight that point to see if you were indeed employed by Flood Brothers and made the amount of money you stated on your application.  So, knowing that do you still . . . say you were employed by Flood Brothers?

(File 1 at 10:19-11:01.)  In response, Crawford stated that he did not want to answer any more questions, and the interview stopped.  (*Id.* at 11:01-11:31.)  Crawford's refusal to answer further questions belies his assertion that the reference to perjury was coercive.   What's more, SA Fike's reference to the signature area of a document he allegedly signed in no way constituted a threat that would undermine the voluntariness of his waiver or statements.

For these reasons, then, the court finds that the government has met its burden to show that Crawford voluntarily, knowingly, and intelligently waived his rights to remain silent when questioned by agents on August 22, 2018, and that his custodial statements during the first portion of the interview, as recorded in File 1, were voluntary.

## IV.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Defendant Fernando Crawford's First Motion to Suppress Statements [Doc. 78] be **DENIED**.

I have now addressed all referred pretrial matters relating to Defendant Crawford and have not been advised of any impediments to the scheduling of a

trial.   Accordingly, this case is **CERTIFIED READY FOR TRIAL** as to this defendant.[4]

IT IS SO RECOMMENDED this 24th day of September 2019.

_____
JOHN K. LARKINS III
United States Magistrate Judge

---

[4] Awad's case has previously been certified ready for trial.  [*See* Doc. 86.]

14